# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| LUÍS M. MARTÍNEZ, | } |
| | } |
|     Plaintiff, | } |
| | } |
| v. | }   Case No.: 2:14-cv-02318-MHH |
| | } |
| CHRISTOPHER LINDEN ESPEY, | } |
| et al., | } |
| | } |
|     Defendants. | } |

## MEMORANDUM OPINION AND ORDER

On May 10, 2014, plaintiff Luis M. Martinez was playing pool at Courtyard Oyster Bar in Alabaster, Alabama. Defendant Christopher Espey, another bar patron, openly and repeatedly threatened Mr. Martinez, commented on Mr. Martinez's race, and ultimately attacked Mr. Martinez with a pool stick. The attack left Mr. Martinez with serious facial injuries.

Based on these events, Mr. Martinez asserts state law claims against Courtyard for premises liability and negligent hiring, training, and supervision of the bar's security guards.[1] Pursuant to Rule 56 of the Federal Rules of Civil

---

[1] Mr. Martinez also asserts assault and battery claims against Mr. Espey. The Court previously denied Mr. Espey's and Mr. Martinez's cross motions for summary judgment with respect to

Procedure, Courtyard seeks judgment as a matter of law on all of Mr. Martinez's claims against the company. (Doc. 39). The Court conducted a hearing on Courtyard's motion on November 1, 2017.[2] Consistent with the discussion held on the record during the November 1, 2017 hearing and for the reasons stated below, the Court grants Courtyard's motion for summary judgment with respect to Mr. Martinez's negligent hiring, training, and supervision claim and denies Courtyard's motion with respect to Mr. Martinez's premises liability claim.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

---

these claims. (Doc. 55). This memorandum opinion concerns only Mr. Martinez's claims against Courtyard.

[2] A court reporter was present, and a transcript is available upon request.

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). In this opinion, the Court describes the evidence accordingly.

## II. RELEVANT FACTS

At approximately 9:00 p.m. on May 9, 2014, Mr. Martinez went to Courtyard Oyster Bar to play pool with his brother. (Doc. 38-1, pp. 10-11, 13). Two hours later, Mr. Martinez's brother left the bar. (Doc. 38-1, p. 11). Mr. Martinez stayed behind and played pool with another individual. (Doc. 38-1, p. 11). Near midnight, Mr. Espey arrived at the bar. (Doc. 38-1, p. 18). Mr. Espey began playing pool near Mr. Martinez. (Doc. 38-1, p. 15).

Mr. Martinez and Mr. Espey were not strangers. Mr. Martinez had encountered Mr. Espey at Courtyard on two other occasions. (Doc. 38-1, p. 11). On both occasions, Mr. Espey made throat-slitting gestures toward Mr. Martinez. Mr. Martinez did not report the threatening conduct to anyone at Courtyard or to the police. (Doc. 38-1, pp. 14-15).

As Mr. Martinez and Mr. Espey played pool at Courtyard in the early morning hours on May 10, 2014, Mr. Espey made throat-slitting and closed-fist gestures toward Mr. Martinez. (Doc. 38-1, pp. 14, 27, 67). Mr. Espey was 6 to 12

feet away from Mr. Martinez when he made the gestures. (Doc. 38-1, p. 29). Mr. Martinez and Mr. Espey did not speak directly with one another (Doc. 38-1, pp. 11-12), but Mr. Martinez overheard Mr. Espey say, "I hate Latinos" and "[f]****** Hispanics." (Doc. 38-1, pp. 24, 66). Mr. Martinez testified that "many people heard" Mr. Espey say, "I hate Latinos." (Doc. 38-1, p. 24). When Mr. Espey made the comment, Mr. Martinez, who was the only Latino at the bar, "turned around and looked at" Mr. Espey, and Mr. Espey "made those gestures that he was going to cut [Mr. Martinez's] throat." (Doc. 38-1, p. 24). Every time Mr. Martinez would turn around, Mr. Espey would mock and make fun of him while making the "gesture like he was going to slit [Mr. Martinez's] throat." (Doc. 38-1, p. 26).

Two security officers were working at Courtyard while Mr. Martinez and Mr. Espey were playing pool. A security guard was sitting at the front door collecting cover charges. (Doc. 38-1, pp. 23, 62). An off-duty, plainclothes police officer was stationed inside the bar. (Doc. 38-1, p. 27). Mr. Martinez testified that the "security and police" at Courtyard "were watching" Mr. Espey and saw him make the threatening gestures. (Doc. 38-1, p. 27).

After some period of time, Mr. Martinez got scared and decided to leave the bar and go home. (Doc. 38-1, p. 24). As Mr. Martinez started to leave, Mr. Espey attacked him from behind with a pool stick. (Doc. 38-1, pp. 14, 62). According to

4

Mr. Martinez, "when I have my – turned my back to him I felt the first hit – the first blow that he busted my face, that he broke my bones, my jaw, my orbit, my eye, and I [be]came unconscious."  (Doc. 38-1, p. 17).  When Mr. Martinez regained consciousness, he was sitting in a chair, and he could not breathe or talk. (Doc. 38-1, p. 17).

According to Mr. Martinez, "everybody saw that the police and the security, the bar what [Mr.] Espey would do referring to me," and "[n]obody did anything about it."  (Doc. 38-1, p. 24).  Mr. Martinez contends that the security officers "didn't do anything" to try to stop the attack "because they did not care about the situation."  (Doc. 38-1, p. 62).  Mr. Martinez testified that Mr. Espey's gestures "were visible from everywhere."  (Doc. 38-1, p. 65).  According to Mr. Martinez, "everybody saw what was going on and nobody did anything to avoid it.  That's why what happened to me happened."  (Doc. 38-1, p. 65).[3]

## III. ANALYSIS

### A. Negligent Hiring, Training, and Supervision

Mr. Martinez maintains that Courtyard negligently hired, trained, and supervised the security officers who were on duty at Courtyard at the time of his attack and that Courtyard's negligence caused his injuries because the security

---

[3] Courtyard has not offered affidavits or other evidence from the security officers to contradict Mr. Martinez's testimony.  Had the bar offered such evidence, the evidence would create a disputed issue of fact.  With or without contradictory evidence, the Court accepts Mr. Martinez's description of events for purposes of summary judgment.

officers saw Mr. Espey making threatening gestures but did not intervene to stop Mr. Espey from assaulting him. Under Alabama law, "[i]n the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him." *Armstrong Business Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001). "It is not sufficient merely to allege, or to show, that the employee acted incompetently." *Southland Bank v. A & A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1216 (Ala. 2008). Instead, "[a] plaintiff must establish 'by affirmative proof' that the employer actually knew of the incompetence, or that the employer reasonably should have known of it." *Southland Bank*, 21 So. 3d at 1216 (quoting *Lane v. Central Bank*, 425 So. 2d 1098, 1100 (Ala. 1983)). A plaintiff satisfies this burden by showing "either that he informed the employer about specific misdeeds of the employee, or that the employee's misdeeds were 'of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.'" *Southland Bank*, 21 So. 3d at 1216 (quoting *Lane*, 425 So. 2d at 1100).

As the Court explained on the record during the November 1, 2017 hearing, Mr. Martinez has offered no admissible evidence that Courtyard owners knew or reasonably should have known of the security officers' alleged incompetence. With respect to Mr. Martinez's negligent hiring and training claim, during the

6

November 1, 2017 hearing, counsel for Mr. Martinez conceded that Mr. Martinez has no evidence that Courtyard owners knew of a deficiency in the security officers' competence when Courtyard hired the officers. Neither has Mr. Martinez produced evidence regarding Courtyard's knowledge of the need to train the security officers.

With respect to his negligent supervision claim, Mr. Martinez admits that he did not tell anyone at Courtyard that Mr. Espey was making threatening gestures and comments. (Doc. 38-1, pp. 14-15). Mr. Martinez has not presented evidence demonstrating that a Courtyard owner or manager was present at the bar to see Mr. Martinez's threatening gestures or that a Courtyard manager witnessed the security guards' failure to intervene after observing those gestures.[4] Even if Mr. Martinez were able to show that Courtyard managers witnessed the security officers' conduct, Mr. Martinez's negligent hiring, training, and supervision claim would fail because the record contains no evidence that the security guards previously witnessed threatening behavior that should have alerted the guards to take action to

---

[4] After the Court held oral argument on Courtyard's motion, the Court gave the parties an opportunity to file supplemental briefing on Mr. Martinez's premises liability claim. (Doc. 55, p. 4). In addition to his brief, Mr. Martinez submitted a number of evidentiary exhibits, including an affidavit in which Mr. Martinez states that the owner of Courtyard was at the bar on May 10, 2014 and that the owner could see Mr. Espey's gestures and hear Mr. Espey's racial slurs. (Doc. 60-1, pp. 1-2, ¶¶ 2-3). The Court will not consider Mr. Martinez's supplemental evidentiary submissions. During the November 1, 2017 hearing, the Court granted Courtyard's request for additional briefing on the premises liability issue. The Court did not solicit nor will it review additional evidence that Mr. Martinez failed to produce during the discovery period for the same reasons that the Court will not consider evidence of damages that Mr. Martinez produced after the close of discovery. (*See* Doc. 55, p. 3; November 1, 2017 hearing transcript).

prevent a fight between bar patrons. "A mistake or single act of negligence on the part of an employee" does not support a negligent supervision claim against an employer. *Southland Bank*, 21 So. 3d at 1216 (Ala. 2008). Accordingly, Courtyard is entitled to judgment as a matter of law on Mr. Martinez's negligent hiring, training, and supervision claim.

B. **Premises Liability**

In a premises liability action, "the elements of negligence are the same as those in any tort litigation: duty, breach, cause in fact, proximate or legal cause, and damages." *Ex parte Harold L. Martin Distributing Co., Inc.*, 769 So. 2d 313, 314 (Ala. 2000). Courtyard argues that Mr. Martinez's premises liability claim fails as a matter of law because he cannot establish that Courtyard owed him a duty.[5] "The existence of a duty is a question of law to be determined by the trial judge." *New Addition Club, Inc. v. Vaughn*, 903 So. 2d 68, 73 (Ala. 2004) (internal quotation marks and alteration omitted). Under Alabama law, "[i]t is well settled that absent a special relationship or special circumstances, a person has no duty to protect another from criminal acts of a third person." *Baptist Mem. Hosp.*

---

[5] Courtyard also maintains that Mr. Martinez has not offered evidence of damages. (Doc. 40, p. 24). The Court previously explained that Mr. Martinez has "fulfilled his obligation to provide evidence of damages because the record contains sufficient evidence of pain and suffering and mental anguish. Mr. Martinez does not have to prove economic losses to proceed with his state law tort claims." (Doc. 55, p. 3) (citing *Slack v. Stream*, 988 So. 2d 516, 531-32 (Ala. 2008)); *see also* November 1, 2017 hearing transcript). The Court also found that Mr. Martinez may rely on his testimony "concerning the time he missed from work and his hourly wage in support of his effort to recover compensatory damages for mental anguish." (Doc. 55, p. 4, n.5).

8

*v. Gosa*, 686 So. 2d 1147, 1149 (Ala. 1996); *see Moye v. A.G. Gaston Motels, Inc.*, 499 So. 2d 1368, 1370 (Ala. 1986).

### 1. Special Relationship

Mr. Martinez has not established the existence of a special relationship sufficient to create a duty. Alabama courts have recognized a special relationship for purposes of premises liability only when there is a "dependence or mutual dependence among the parties." *Young v. Huntsville Hosp.*, 595 So. 2d 1386, 1389 (Ala. 1992) (internal quotation marks and citation omitted). The test is stringent.

Applying this "dependence" test, in *Young*, the Alabama Supreme Court stated that "we can hardly imagine a situation in which a person is more dependent on another for basic bodily protection and care than the situation of an anesthetized or sedated patient" and held that "the 'special relationship' between a sedated and anesthetized patient and a hospital or health care facility creates a duty on the hospital's or health care facility's part to protect the patient from criminal acts of third parties." *Young*, 595 So. 2d at 1389; *see Emery v. Talladega College*, 668 Fed. Appx. 727, 735 (11th Cir. 2017) (stating that the Alabama Supreme Court "has only applied [the special relationship] exception in the rare case where the plaintiff is wholly at the mercy of the defendant to keep him safe from harm"); *Saccuzzo v. Krystal Co.*, 646 So. 2d 595, 597 (Ala. 1994) ("We held that a 'special relationship' existed in *Young* because an anesthetized patient is completely

dependent upon the hospital for protection."); *see also Finley v. Patterson*, 705 So. 2d 826, 828 (Ala. 1997) (explaining that a plaintiff must be "completely dependent upon the defendants for protection" for the special relationship exception to apply).

Mr. Martinez has not shown that he was completely dependent upon Courtyard for protection, and Mr. Martinez's status as an invitee at Courtyard, by itself, is not sufficient to invoke the special relationship exception. *See Broadus v. Chevron USA, Inc.*, 677 So. 2d 199, 204 (Ala. 1996) ("Broadus also argues that he was a business invitee of Chevron and Larry Ayres d/b/a Regency Chevron and argues that a 'special relationship' existed between him and the defendants. As above noted, no special relationship was established by the facts of this case."); *Johnston v. Mr. Mini Mart No. 50*, 744 So.2d 922, 926 (Ala. Civ. App. 1999) ("A special relationship is not created by the fact that Mrs. Johnston and Sample were invitees at the Mini Mart store."). Therefore, Mr. Martinez cannot establish the duty element of his premises liability claim by relying on the special relationship test.

### 2. Special Circumstances

Mr. Martinez has presented evidence relating to special circumstances that may give rise to a duty. The special circumstances exception applies when a premises owner "'possessed actual or constructive knowledge that criminal activity which could endanger an invitee was a probability.'" *Moye*, 499 So. 2d at 1371

(quoting *Ortell v. Spencer Cos., Inc.*, 477 So. 2d 299, 299 (Ala. 1985)). In other words, "'special circumstances' exist only when the defendant 'knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff.'" *Saccuzzo*, 646 So. 2d at 598.

Under this standard, a plaintiff must show three elements. "First, the particular criminal conduct must have been foreseeable. Second, the defendant must have possessed 'specialized knowledge' of the criminal activity. Third, the criminal conduct must have been a probability." *Tenn Tom Bldg. v. Oden, Nicholas & Copeland, P.C.*, 908 So. 2d 230, 233 (Ala. 2005) (internal quotation marks, citation, and emphasis omitted). "Essentially, these factors speak to one central question: was the plaintiff's injury sufficiently foreseeable by the defendant premises owner, such that there was a duty for the defendant to try to prevent the harm." *Emery*, 668 Fed. Appx. at 731.

The Alabama Supreme Court "has rarely held that the danger to an invitee posed by the potential criminal act of a third person was so imminent that the premises owner should have foreseen the eventual consequence." *Hail v. Regency Terrace Owners Ass'n,* 782 So. 2d 1271, 1274-75 (Ala. 1999); *see, e.g.*, *New Addition Club*, 903 So. 2d at 76; *Carroll v. Shoney's Inc.*, 775 So. 2d 753 (Ala. 2000); *Gosa*, 686 So. 2d at 1151; *E.H. v. Overlook Mountain Lodge*, 638 So. 2d 781 (Ala. 1994); *Moye*, 499 So. 2d at 1370 (collecting cases). In a small number

11

of cases, the Alabama Supreme Court has applied the special circumstances exception. *See Hail v. Regency Terrace Owners Ass'n*, 782 So. 2d 1271 (Ala. 1999); *Thetford v. City of Clanton*, 605 So. 2d 835 (Ala. 1992); *Nail v. Jefferson County Truck Growers Association, Inc.*, 542 So. 2d 1208 (Ala. 1988).[6]

In *Hail*, a fire that began in a maintenance man's office at a condominium complex killed the plaintiff's decedent, and the decedent's estate sued the realty company that managed the condominium building and the condominium association under a premises liability theory. *Hail*, 782 So. 2d at 1272-74. The defendants argued that they were not liable because the fire was not foreseeable. *Hail*, 782 So. 2d at 1275. The Alabama Supreme Court found that the evidence contradicted the defendants' argument. *Hail*, 782 So. 2d at 1275. In the 13 months before the fatal fire, 8 to 13 fires had occurred on the condominium premises. *Hail*, 782 So. 2d at 1273. The members of the condominium association were aware that the building's maintenance man was one of two arson suspects. *Hail*, 782 So. 2d at 1273, 75. The condominium association had held numerous meetings with residents about the fires during which the residents expressed their

---

[6] Mr. Martinez cites *Brock v. Watts Realty Co., Inc.*, 582 So. 2d 438 (Ala. 1991). In that case, the Alabama Supreme Court found that a landlord owed a duty to protect a tenant from "foreseeable harm, i.e., crime" because relevant statutes and ordinances required the landlord to maintain locks on the tenant's door "in satisfactory working condition." *Brock*, 582 So. 2d at 441. *Brock* did not apply the special circumstances analysis, and instead, found that the landlord had a statutory duty to protect a tenant from being murdered.

12

"desire to get the maintenance man off the property, yet he was not removed until after [the fatal] fire." *Hail*, 782 So. 2d at 1274. The condominium association installed new fire equipment and added additional security devices after the fatal fire. *Hail*, 782 So. 2d at 1275. Based on these circumstances, the Alabama Supreme Court held that the issue of foreseeability was one for the jury. *Hail*, 782 So. 2d at 1275.

In *Thetford*, the plaintiff's decedent checked into a hotel under a false name and "told the desk that she was hiding from her husband and requested that the desk clerk not tell anyone she was there." *Thetford*, 605 So. 2d at 837. The decedent "also requested that her husband not be permitted to enter her room." *Thetford*, 605 So. 2d at 837. The desk clerk noticed that the decedent "appeared to have been beaten and that she had a bald spot on her head." *Thetford*, 605 So. 2d at 837. When the decedent's husband arrived at the hotel three days later, the hotel manager cut the chain lock on the decedent's room door and permitted the decedent's husband to access the room. *Thetford*, 605 So. 2d at 837. The hotel manager overheard the decedent's husband say to the decedent, "I am going to kill you." *Thetford*, 605 So. 2d at 837-38. The decedent's husband left the hotel with the decedent and beat her to death at a different location. *Thetford*, 605 So. 2d at 838. In reversing the trial court's grant of summary judgment to the hotel on the plaintiff's premises liability claim, the Alabama Supreme Court explained that

13

special circumstances made summary judgment inappropriate because "the fact that [the plaintiff] notified the hotel clerk that she had been beaten by her husband and was hiding from him for fear of additional abuse would permit a jury to conclude that the hotel manager could foresee another beating by the husband." *Thetford*, 605 So. 2d at 841.[7]

In *Nail*, farmers' market tenants shot each other after a fight between their employees. *Nail*, 542 So. 2d at 1210. One of the tenants and his injured employee sued the operator of the farmers' market. The Alabama Supreme Court held that at trial, the plaintiffs "produced sufficient evidence that the [Farmers'] Market knew or should have known there was a probability of conduct by third persons that would endanger the plaintiffs" based the following special circumstances:

> There is evidence that the Market knew for several weeks before the shootout on July 4 that the feuding between the Nail and Keith employees was going on. The record also reveals that the Market knew who the participants were, as well as why the hostility was mounting. Nail testified that he and his mother went to Bert Swann twice to express their fear that someone was going to get hurt in Shed One and to ask Swann to put an extra security guard on the premises. Swann himself conceded that Mrs. Nail came to him around four days before the shootout and said that Billy Joe Keith was threatening her son. Keith also testified that he went to Swann's office during the last part of June and told Swann about the tension developing in Shed One.

---

[7] The Alabama Supreme Court has recognized that "[a]lthough the Court did not specifically say so, the innkeeper-guest relationship in *Thetford* also comes within the 'special relationship' exception to the general no liability rule." *Sacuzzo*, 646 So. 2d at 597.

14

*Nail*, 542 So. 2d at 1212. The Alabama Supreme Court explained that "this evidence was sufficient for the jury reasonably to conclude that violence [at the farmers' market] was foreseeable" because "the hostility in this case fermented over a period several weeks before the shootout, and the Market was apprised of the growing animosity." *Nail*, 542 So. 2d at 1212.

Courtyard argues that Mr. Espey's assault on Mr. Martinez was not foreseeable because Mr. Martinez did not verbally notify Courtyard or law enforcement of Mr. Espey's threatening behavior, and Mr. Espey's attack on Mr. Martinez was not anticipated. Though the record contains no evidence that indicates that Mr. Martinez spoke to the plainclothes police officer to complain about Mr. Espey's conduct, Mr. Martinez has offered unrebutted testimony that the officer saw Mr. Espey making throat-slitting and closed-fist gestures toward Mr. Martinez during a two-hour period immediately preceding the attack. Mr. Espey and Mr. Martinez were playing pool 6 to 12 feet apart. (Doc. 38-1, pp. 24, 27, 62, 65). Viewing the evidence in the light most favorable to Mr. Espey, given the particular circumstances of this case involving a bar open until the early hours of the morning, monitored by a plainclothes, armed police officer who witnessed repeated threatening gestures directed from Mr. Espey toward Mr. Martinez, the evidence indicates that Courtyard knew or had a reason to know that Mr. Martinez

faced a probability of harm, and Courtyard had a duty to try to prevent the harm.[8] Specifically, the evidence indicates that Courtyard knew or should have known that Mr. Espey would attack Mr. Martinez. *See Emery*, 688 Fed. Appx. at 732 ("The foreseeability of a given act, however, does not revolve around that act's legal classification but the facts surrounding the act.").[9]

Courtyard contends that the temporal proximity of Mr. Espey's conduct and the resulting attack does not create a duty. Temporal proximity of certain events alone may not establish that a premises owner owes a duty to an invitee to protect the invitee from the criminal acts of third parties. *Emery*, 688 Fed. Appx. at 735 ("[T]he temporal proximity of the present events—all occurring within an hour or two—does not necessarily render the later shooting foreseeable.") (citing *Carroll*, 775 So. 2d at 754-57).

---

[8] The Alabama Supreme Court "has repeatedly rejected the argument that the presence of security guards or security systems" standing alone "gives rise to an inference that the business owners foresaw the possibility of criminal activity on the part of third persons." *Bailey v. Bruno's, Inc.*, 561 So. 2d 509 (Ala. 1990). The Alabama Supreme Court also has quoted with approval this rule: "There is no duty upon the owners or operators of a shopping center, individually or collectively, or upon merchants and shopkeepers generally, whose mode of operation of their premises does not attract or provide a climate for crime, to guard against the criminal acts of a third party, *unless they know or have reason to know that acts are occurring or about to occur on the premises that pose imminent probability of harm to an invitee;* whereupon a duty of reasonable care to protect against such act arises." *Henley v. Pizitz Realty Co.,* 456 So.2d 272, 276-77 (Ala. 1984) (quoting *Cornpropst v. Sloan*, 528 S.W.2d 188, 198 (Tenn. 1975), *abrogated on other grounds by McClung v. Delta Square, Ltd. Partnership*, 937 S.W.2d 891 (Tenn. 1996) (emphasis in *Henley*).

[9] Mr. Martinez does not have to establish that Courtyard should have known that Mr. Espey would assault him with a pool stick. Mr. Martinez must show only that there was a probability of an assault. *Thetford*, 605 So. 2d at 8 ("Foreseeability does not require that the particular consequence should have been anticipated, but rather that some general harm or consequence could have been anticipated.").

In *Emery* and *Carroll*, temporal proximity did not give rise to a duty on the part of the defendant premises owners to prevent an attack where there was a break in the chain of events that led to the attack. In *Emery*, an unidentified individual shot the plaintiff on his dorm porch. *Emery*, 688 Fed. Appx. at 729. The plaintiff sued the college and university officials for negligence and argued that "the specific events involving [him] in the few hours leading up to the shooting made the later shooting foreseeable, such that Defendants acquired a duty of care to [him]." *Emery*, 688 Fed. Appx. at 732. In an unpublished opinion, the Eleventh Circuit rejected the plaintiff's duty argument, in part because even though the plaintiff "was involved in two previous altercations with local individuals (one verbal and the other a physical fist fight) prior to the shooting, the university never received any specific, actual notice that a shooting was imminent" because the university police broke up the fist fight and dispersed the local individuals involved. *Emery*, 688 Fed. Appx. at 733. The Eleventh Circuit concluded that "[n]o [u]niversity official had any kind of particularized or specific notice that a shooting would later occur." *Emery*, 688 Fed. Appx. at 733.

In *Carroll*, the husband of a restaurant employee shot and killed his wife on the restaurant premises. *Carroll*, 775 So. 2d at 754. Two days before the shooting, the decedent informed her manager that the night before, her husband "had beaten and choked her and that he had threatened her." *Carroll*, 775 So. 2d at 754. The

17

decedent told her manager that she did not want to talk to her husband and asked the restaurant to call police if her husband came to the restaurant. *Carroll*, 775 So. 2d at 754. That evening, the decedent's husband came to the restaurant, managers called the police, and the police detained the husband briefly. *Carroll*, 775 So. 2d at 754. The police released the husband after the restaurant decided not to press charges. The decedent's co-workers paid for a hotel room for the decedent that evening because she was afraid to go home. *Carroll*, 775 So. 2d at 754. The following day, the decedent called her manager and said that she was afraid to come to work, but the employer told her to come to work anyway. *Carroll*, 775 So. 2d at 755. During the decedent's shift, her husband entered the restaurant and shot her in the back of the head. *Carroll*, 775 So. 2d at 755. The Alabama Supreme Court found that the restaurant could not have reasonably foreseen that the decedent's husband would return to the premises and murder her. *Carroll*, 775 So. 2d at 757.

In *Carroll* and in *Emery*, the premises owners and police diffused an initial confrontation, and time passed between those events and the criminal conduct that ensued. Here, the undisputed evidence demonstrates that a police officer was present and witnessed threatening conduct over a two-hour period, but the officer did nothing; he did not intervene. (Doc. 38-1, pp. 14, 24, 27, 67). The temporal proximity of Mr. Espey's conduct and the assault weighs in favor of finding that

that Courtyard was "given actual, express, and specific notice that [Mr. Espey] might attempt to commit a criminal act against [Mr. Martinez]" such that Courtyard owed a duty to Mr. Martinez. *Gosa*, 686 So. 2d at 1151.

## IV. CONCLUSION

For the reasons stated above, the Court grants Courtyard's motion for summary judgment with respect to Mr. Espey's negligent hiring, training, and supervision claim. The Court dismisses that claim with prejudice.

The Court denies Courtyard's motion for summary judgment with respect to Mr. Martinez's premises liability claim.

The Court **SETS** Mr. Martinez's assault and battery claims against Mr. Espey and Mr. Martinez's premises liability claim against Courtyard for a jury trial at **9:00 a.m.** on **July 30, 2018**. By separate order, the Court will provide the parties with additional pre-trial instructions.

**DONE** and **ORDERED** this March 8, 2018.

_/s/ Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE